**AFFIRM; and Opinion Filed July 25, 2016.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-15-00689-CR

**AMON TAWANDA DZWAIRO, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the 219th Judicial District Court**
**Collin County, Texas**
**Trial Court Cause No. 219-82237-2013**

## MEMORANDUM OPINION
Before Justices Francis, Fillmore, and Schenck
Opinion by Justice Fillmore

A jury found appellant Amon Tawanda Dzwairo guilty of the murder of his wife, Judith

Dzwairo.[1]   After finding Amon acted under the immediate influence of sudden passion arising

from an adequate cause, the jury assessed punishment of twenty years' imprisonment.  In his first

point of error, Amon contends the evidence is insufficient to prove the culpable mental state

under section 19.02(b)(1) of the penal code of intentionally or knowingly causing Judith's death,

*see* TEX. PENAL CODE ANN. § 19.02(b)(1) (West 2011), or the culpable mental state under

section 19.02(b)(2) of the penal code of intentionally causing serious bodily injury to Judith, *see*

*id*. § 19.02(b)(2).  In his second point of error, Amon contends there is insufficient evidence to

---

[1] Because appellant, his wife, and their children have the same surname, we refer to them in this opinion by their first names.

prove the act of striking Judith with a belt or blunt object was clearly dangerous to human life. *See id.* § 19.02(b)(2). We affirm the trial court's judgment.

## Factual Background

From July 23, 2013, through the night of July 25, 2013, Amon argued with Judith about her relationship with Darrell Roberson. Amon and Judith's older son, Tinopiwanashe Dzwairo (Tino), testified the arguing began on July 23, 2013. Tino, his younger brother, Takapiwanashe (Taka), Amon, and Judith attended a baseball game. Amon and Judith argued at the game and on the way home about information on Judith's cellular phone and whether Judith had been talking to another man. Taka testified that Judith and Amon again argued the evening of July 24, 2013, and that night Judith went to sleep in Taka's bedroom because she was afraid, but Amon came into Taka's room and forced Judith out of Taka's bed.

In his testimony at trial, Amon described events that occurred during and following the family's July 23, 2013 baseball game outing. Amon and Judith argued after the baseball game regarding a text message from Roberson. The following day, Amon argued with Judith regarding the volume of text messages sent to Roberson from her cellular telephone. Amon was very angry and "just beside [himself]." He went to a bar after dinner, and while there he received a text message from Judith saying she was scared and going to sleep in Taka's bedroom. Amon replied there was no need for her to sleep in Taka's bedroom. Amon arrived home at about 3:00 a.m.; Judith was in Taka's bedroom. He denied that he forced Judith out of Taka's bed. According to Amon, Judith went with him to their bedroom, and she fell asleep.

On July 25, 2013, Tino heard Amon talking to Judith's cellular phone service provider, asking for information regarding text messages sent from Judith's phone. Text messages from Judith's and Amon's cellular phones, and copies of text messages between Judith and Amon and between Judith and Roberson, were admitted into evidence. Amon wrote to Judith that, "If you

[sic] of me now, you don't want to find out the other side of me you don't know." Judith responded that, "I definitely don't want to feel any more afraid than I do now." Judith wrote to Amon that she was afraid because "you keep assuring me of dreadful threats." She also sent the following text messages to Amon: "You sound like you want to make it your life's work to dig for stuff and then come as close to killing me as possible with anything slight. It's understandable because of everything, but it's unfair to you, and very scary for me" and "You haven't said you think you can start learning to trust again and forgive; just close to death threats. Just sounded you will do anything to fulfill them." Judith wrote to Amon that she had not been able to defend herself against him in the past, and his threats were frightening. Amon sent a text message to Judith that said, "If you lie to me, don't stick around becoz [sic] it won't be pretty."

Sometime after Judith arrived home from work at about 8:30 p.m. on July 25, 2013, Amon confronted her, "insisting" something was going on between her and Roberson. Judith eventually admitted that she and Roberson had a sexual relationship. Amon began recording their argument on his cellular phone. That lengthy recording of arguing between them was played at trial. Plano police detective Brian Pfahning acknowledged that at no point in the recording did Amon "fly into a rage." However, at one point in the recording, Judith can be heard to scream. Amon told her to "relax" and he was "okay" and "over it." Judith told Amon she was scared, to which Amon replied, "Why would I hit you? If I wanted to hit you, I would have done it a long time ago." Amon testified the reason Judith screamed was because she was lying in bed with covers over her head and he frightened her when he violently pulled the covers back. Divorce was discussed numerous times during the recording; Judith stated she wanted to remain married to Amon, and he testified that was also what he wanted. Amon testified he was "hurt real bad," confused, and angry.

Amon testified that at about 2:00 a.m., he left their home for about five minutes. When he returned home, Judith, who was five feet tall, ran into Amon, who is six feet four inches tall. Judith began to hit him, he lost his balance, and "leaned into" Judith. Judith lost her balance and had a "small fall" on the landing of the stairs. Neither Judith nor Amon were injured, and they went back into their bedroom to talk about Roberson "and the lies." Amon proceeded to view photographs on Judith's phone. He believed a photograph of their bedroom had been sent to Roberson and that Judith had tried to avoid going to the July 23, 2013 baseball game so that Roberson could come to her home and have sex with her. Amon testified that Judith repeatedly told him that he did not "understand," and eventually told him she was trying to retrieve a sex videotape from Roberson that they had recorded.

Amon denied he hit or physically assaulted Judith in any way before July 25, 2013. However, he testified that at that point, he "lost it." He picked up a torn and frayed belt from a chest of drawers and struck Judith with it. He testified he struck her in the lower extremities and buttocks. He testified he was trying to cause pain and he was causing Judith pain. He hit Judith again as she was running around the bed trying to get away from him. He was striking Judith with the belt "hard and fast." Judith was yelling and saying, "No, Amon. No, Amon, no." Judith grabbed the belt, and Amon yanked it back and struck Judith a few more times. Judith again grabbed the belt and said, "Stop, Amon, stop" as she was holding the belt. Amon testified that at that point, he stopped striking Judith with the belt, and he and Judith apologized to one another. Amon went downstairs to get Judith a bottle of water. Judith was sitting on the bed; she was not complaining of back pain. It was after 2:00 a.m. He and Judith went to sleep for about an hour.

According to Amon's testimony, after sleeping for about an hour, Judith awoke and said she needed some ibuprofen, which did not surprise Amon because he knew he had struck her and

–4–

she could be in pain. Amon obtained water from the bathroom for Judith; she took ibuprofen and drank the water. He became concerned because Judith was holding her back and saying her back and buttocks hurt and that she was in pain. She asked Amon to rub her back, and when he did, she began to moan in pain, at which point he thought he needed to call an ambulance. Amon testified Judith never lost consciousness before he sought emergency medical care for her.

Amon testified he was not thinking about his argument with Judith waking Tino and Taka, and he assumed they were sleeping. Taka testified he did not hear Amon and Judith arguing the night of July 25, 2013. Tino, however, testified that after going to bed around 10:00 or 11:00 p.m., he awoke around 2:00 a.m. and heard Judith yelling, "Amon, no, stop," and a "constant" clapping or slapping sound, "like a belt." Tino was shocked, did not know what was happening, and had never heard anything like that in his house before. He went back to sleep, and when he awoke ten to fifteen minutes later, he heard the same slapping sound and Judith's voice, although weaker. Tino fell asleep once more and when he awoke ten to fifteen minutes later, he heard the same slapping sound and heard Judith's voice only occasionally. Amon disagreed with Tino's testimony that Judith's screaming grew fainter, and Amon stated Tino was lying about that. Amon testified Judith's screaming became louder. Tino testified he fell asleep for the fourth time and was awakened by the police around 4:00 a.m.

At 4:07 a.m. on July 26, 2013, Amon placed a 9-1-1 telephone call requesting emergency medical care for Judith. Amon did not tell the operator he had hit Judith with a belt, and he lied to the operator about what had happened to Judith. In that 9-1-1 telephone call, Amon stated he and Judith were arguing, she charged him, he pushed her, and she fell. He stated he is a "big guy" and probably pushed her too hard. Judith's faint voice can be heard in the recorded 9-1-1 telephone call played at trial.

–5–

Plano police officers and fire department personnel who responded to the 9-1-1 call found Judith in the upstairs master bedroom lying on the bed, moaning, rolling from side to side, and complaining of back pain. When Judith's back was examined, marks and raised welts approximately one and one-half inches apart running horizontally from hip to hip on her lower back, bruising, and rectangular marks in different locations on her back were observed. Plano fire department paramedic Roy Week saw an obvious sign of trauma to Judith in the form of bruising on her back, but he did not see anything in the bedroom indicating someone had been involved in an activity that was clearly dangerous to human life, although he saw a belt on the bed. To Plano paramedic firefighter Alberto Valdez, it appeared that some foreign object had struck Judith's back. A broken belt with no buckle was lying on the floor at the foot of the bed and a belt with a silver buckle was lying on the opposite side of the bed from Judith. Those belts were later collected as evidence, and photographs of those belts were admitted in evidence at trial.

Judith's vital signs were normal when she was being examined by the paramedics. However, she would not follow commands and said several times she was tired and wanted to go to sleep. Based on her inability to follow commands and the paramedics' inability to determine what was "going on," it was decided Judith should be transported to a hospital for evaluation. After Judith was moved downstairs and into an ambulance, her condition deteriorated and she suffered cardiac arrest. Valdez was surprised by Judith's cardiac arrest. On four or five other occasions, Valdez had witnessed patients whose condition deteriorated from being responsive to experiencing cardiac arrest as quickly as did Judith. However, Valdez previously had not witnessed anyone experience cardiac arrest from being struck on the back. Valdez had responded to situations in which someone had been beaten to death, but those situations were different from Judith's; in those situations he had observed external bleeding or head injuries.

Following efforts to revive her, Judith regained a pulse and her blood pressure rose during transport to the hospital.

At the hospital, Plano police officer Stephen Howell saw large and extensive bruising on Judith's legs, arms, and back and a rectangular mark he believed was caused by a belt buckle or where "the leather of a belt buckle would connect on a belt." Amon was arrested that day at his residence for aggravated assault with a deadly weapon and taken to jail. Pfahning testified there was no blood observed at the crime scene. Two belts were collected from Amon and Judith's bedroom during the crime scene investigation.

Judith's sister, Fiona Newhouse, testified that when she saw Judith in the hospital on July 26, 2013, Judith was "beaten up," with bruises all over her body and especially around her legs. Nurses, doctors, and police officers were asking what had happened to Judith. Newhouse's brother-in-law, Marvin Dale Jordan, testified that when he saw Judith in the hospital the morning of July 26, 2013, she was "unidentifiable," her body was severely swollen, and she was on a ventilator.

After being arrested, Amon called Newhouse's cellular phone from jail to check on Judith's condition. Jordan spoke on the phone with Amon, and the recording of that phone call was played at trial. In the call, Amon stated that Judith had an extramarital affair, they argued, and he "overreacted." Amon said he had "never done this before." Jordan told Amon there were belt buckle marks all over Judith's body, but Amon testified he knew that statement was not true. More specifically, Amon testified he knew Jordan's statement that Judith had been hit on the neck and head was not true. Jordan told Amon that Judith was dying. Amon thought he was not being told the truth because he "just hit her with a belt." Amon's reaction was, "Oh, damn," and "oh, shit." He said he hit Judith with a belt, he did not want to use his hand, and he only hit the

bottom part of her body. Jordan told Amon his sons had heard what had happened, and Amon stated he was very sorry and he wished "the kids had come in. I lost it."

Amon did not know the number of times he struck Judith with the belt, but testified it was probably ten times, and he did not think he struck her twenty times. Although he testified the beating must have been two or three minutes in duration, he testified, "I hit her for a long time; yeah." According to Amon, he did not strike Judith with his hands, he did not kick or choke Judith, and he did not strike Judith in the head.

Judith died at 4:16 a.m. on July 27, 2013, and Collin County medical examiner William Rohr, M.D., performed an autopsy to determine the cause and manner of her death. Judith was thirty-four years of age and had no underlying health problems. There were no lacerations of Judith's vital organs. On examination, Rohr observed many areas of external contusion or bruising, with some of the bruising being "very heavy." There was bruising on Judith's back, upper arms, buttocks, and thighs, hand, and right foot. There were external markings on Judith's body that were generally linear in nature, as well as some patterned, rectangular-shaped marks. Bleeding in the skin probably resulted from impact of the edge of an object. Rohr testified the bruising showed sharp edges consistent with infliction by a belt, and the width of bruising matched the belts collected at the crime scene.[2] Rohr would classify a belt as a blunt object. Rohr did not know if Judith's injuries were inflicted by more than one belt and did not know if a belt buckle impacted Judith.

Rohr testified that Judith had a normal platelet count in the hospital at 5:20 a.m., but by 10:30 a.m., her platelet count had decreased. Rohr testified there was a "bleeding episode" and Judith lost a great deal of blood while she was in the hospital. Rohr's opinion was that Judith

---

[2] Plano police detective Elizabeth Spillman also testified the size of marks on Judith's body were consistent with the size of the belts from the crime scene.

died as a result of massive blunt force trauma, and it was his clinical impression that the massive blunt force trauma caused disseminated intravascular coagulation (DIC).

Rohr explained that when a person experiences trauma, blood clotting stops bleeding in the areas of trauma. However, when that mechanism is "out of control," as when one experiences massive blood loss from trauma, all of the proteins used in performing the function of clotting are expended. When afflicted with DIC, one experiences a "huge amount of hemorrhagic blood loss," there is tremendous loss of the percentage of red blood cells and platelets, and blood begins to ooze into tissue where blood vessels have been broken. Rohr testified the blunt object Judith was struck with caused massive tissue trauma. As Judith began to lose blood internally from her injuries, her blood clotting mechanisms ceased to function properly, resulting in additional blood oozing internally into soft tissue and fat tissue. Judith's DIC condition persisted for twenty-four hours. In his experience, Rohr had seen many cases of DIC, but he had never seen DIC brought about in this manner.

Plano police detective Brian Epperson testified welts present on Judith's body appeared to be belt marks. Through investigation, Epperson learned Amon struck Judith with a belt and had "lost control." Epperson's investigation led him to conclude Amon's animosity toward Judith began the night of the baseball game and continued for two days, culminating in Amon hitting Judith with the belt to the point of causing her serious bodily injury and resulting in her death.

When Epperson learned the autopsy revealed no major internal injuries and Judith's injuries were caused by blunt force trauma inflicted by a belt, he realized this was a very unusual case that involved a great deal of force, energy, and anger. Judith suffered cardiac arrest following the beating; Epperson was not surprised that she died, but was surprised by the method that caused her death. In his thirty-four years as a detective, Epperson had not encountered a

person's death as a result of being beaten with a belt. Epperson testified Judith's injuries were by means not ordinarily calculated to produce death, and hitting a person with a belt is not an act that generally would be clearly dangerous to human life. If hit with a belt on the legs and arms a "minimum amount of times," Epperson would not expect a person to suffer a heart attack. However, Epperson testified a belt can cause serious bodily injury if a person is struck with it repeatedly. While a belt is not per se a deadly weapon, the manner of it its use in this case caused the belt to become a deadly weapon. Epperson believed Amon knew there was a reasonable certainty Judith was going to die as a result of the assault. Although Epperson did not opine that Amon intended Judith to die the first or second time he struck her with the belt, he believed Amon formed the intent to kill her and wanted her to die by the time he stopped striking her. Epperson opined that "at a certain point there is a number of strikes" with a belt for punishment that crosses a line into "the serious bodily injury realm," and that was what Epperson believed occurred in this case. Although Epperson acknowledged that where there is no external sign of bleeding, a person may not know they have "crossed the line," he believed Amon should have been aware the blows he was inflicting were "too much."

Epperson testified Judith sustained serious bodily injury, including cardiac arrest, unconsciousness, and blunt force trauma, and he believed Amon intentionally caused serious bodily injury to Judith that resulted in her death. Epperson did not believe the investigation supported a conclusion that Amon acted recklessly or with criminal negligence. In Epperson's opinion, Amon's beating of Judith was an act clearly dangerous to human life.

Amon testified he is responsible for Judith's death and he caused massive blunt force trauma to Judith's body by hitting her between ten and twenty times with a belt. He testified he meant to hit and hurt Judith and causing her pain was his goal. Amon did not think that hitting Judith with a belt on her arms, legs, and buttocks was an act clearly dangerous to her life, nor did

he think he was creating a substantial risk of death. Amon stated he killed Judith under the influence of sudden passion. He stated he was guilty of manslaughter because he recklessly caused Judith's death by striking her with a belt. He denied he was guilty of murder.

**Procedural Background**

By indictment, Amon was charged with alternative theories of murder: intentionally or knowingly causing Judith's death by striking her with a belt; intentionally or knowingly causing Judith's death by striking her with a blunt object; with intent to cause serious bodily injury to Judith, committing an act clearly dangerous to human life that caused Judith's death by striking her with a belt; and with intent to cause serious bodily injury to Judith, committing an act clearly dangerous to human life that caused Judith's death by striking her with a blunt object. *See* TEX. PENAL CODE ANN. §§ 19.02(b)(1), (2). At trial, the jury charge contained those alternative theories of murder. The jury rejected the lesser-included offenses of manslaughter and criminally negligent homicide and found Amon guilty of murder as charged in the indictment. The jury found he acted under the immediate influence of sudden passion arising from an adequate cause and assessed punishment of twenty years' confinement. *See* TEX. PENAL CODE ANN. § 19.02(d) (at punishment stage of trial, defendant may raise issue as to whether he caused the death under the immediate influence of sudden passion arising from an adequate cause); *Gaona v. State*, No. 05-15-00541-CR, 2016 WL 3947378, at *3 (Tex. App.—Dallas July 18, 2016, no pet. h.). In two points of error, Amon asserts there is insufficient evidence to prove the culpable mental state of intentionally or knowingly causing Judith's death or intentionally causing serious bodily injury to Judith, or that the act of striking Judith with a belt or blunt object was clearly dangerous to human life.

**Standard of Review**

We review the sufficiency of the evidence under the standard set out in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Fernandez v. State*, 479 S.W.3d 835, 837 (Tex. Crim. App. 2016). We examine all the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson,* 443 U.S. at 319; *Fernandez*, 479 S.W.3d at 837–38. This standard recognizes "the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319; *see also Adames v. State*, 353 S.W.3d 854, 860 (Tex. Crim. App. 2011). The fact finder is entitled to judge the credibility of the witnesses, and can choose to believe all, some, or none of the testimony presented by the parties. *Chambers v. State*, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991); *see also Wise v. State*, 364 S.W.3d 900, 903 (Tex. Crim. App. 2012) ("The factfinder exclusively determines the weight and credibility of the evidence.").

We defer to the fact finder's determinations of credibility, and may not substitute our judgment for that of the fact finder. *Jackson*, 443 U.S. at 319; *Thornton v. State*, 425 S.W.3d 289, 303 (Tex. Crim. App. 2014); *King v. State*, 29 S.W.3d 556, 562 (Tex. Crim. App. 2000) (in conducting legal sufficiency analysis, appellate court "may not re-weigh the evidence and substitute our judgment for that of the jury"). When there is conflicting evidence, we must presume the fact finder resolved the conflict in favor of the verdict, and defer to that resolution. *Jackson*, 443 U.S. at 326; *Blea v. State*, 483 S.W.3d 29, 33 (Tex. Crim. App. 2016). Circumstantial evidence is as probative as direct evidence and, alone, can be sufficient to establish guilt. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). Evidence is sufficient if "the inferences necessary to establish guilt are reasonable based upon the cumulative

force of all the evidence when considered in the light most favorable to the verdict." *Wise*, 364 S.W.3d at 903. A verdict of guilt will be upheld if the evidence is sufficient on any one of the theories submitted. *See Hooper*, 214 S.W.3d at 14.

**Sufficiency of the Evidence**

In his first point of error, Amon asserts there is insufficient evidence to prove the culpable mental state of intentionally or knowingly causing Judith's death, *see* TEX. PENAL CODE ANN. § 19.02(b)(1), or the culpable mental state of intentionally causing serious bodily injury to Judith, *see id*. § 19.02(b)(2). Amon argues the State failed to prove that it was his conscious objective or desire to cause Judith's death.

"A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result." *Id*. § 6.03(a) (West 2011). Evidence at trial established Amon intended to cause bodily injury. "Bodily injury" means "physical pain, illness or any impairment of physical condition." *Id*. § 1.07(a)(8) (West Supp. 2015). Amon testified without equivocation that he intended to and was causing Judith pain by striking her with a belt, and he was not surprised she needed ibuprofen to alleviate the pain he inflicted. That physical pain constitutes "bodily injury" under section 1.07(a)(8) of the penal code. *See id*.

"Serious bodily injury" means "bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." *Id*. § 1.07(a)(46). Epperson testified Judith sustained serious bodily injury, including cardiac arrest, unconsciousness, and blunt force trauma, and he believed Amon intentionally caused serious bodily injury to Judith that resulted in her death. Amon testified he is responsible for Judith's death and he caused massive blunt force trauma to Judith's body by hitting her between ten and twenty times with a belt. Judith's death was caused

–13–

by the serious bodily injury inflicted by Amon, that is, the massive blunt force trauma she sustained from being beaten with a belt. *See id*. § 19.02(b)(2).

A person commits murder if he "intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual." TEX. PENAL CODE ANN. § 19.02(b)(2). The evidence, and reasonable inferences that can be drawn from the evidence, are sufficient to show Amon intended to cause serious bodily injury to Judith. We conclude a reasonable juror could have found beyond a reasonable doubt that Amon intended to cause serious bodily injury to Judith, and we resolve Amon's first point of error against him.[3]

In his second point of error, Amon asserts that even if we conclude there is sufficient evidence to show he intended to cause serious bodily injury, there is insufficient evidence to establish that striking Judith with a belt was an act clearly dangerous to human life. *See id*. Evidence established Amon, a "big guy" sixteen inches taller than Judith, "overreacted" and "lost it," striking Judith repeatedly with a blunt object, a belt, "hard and fast." Despite Judith telling Amon "no" and asking Amon to stop beating her, Amon continued to hit her with a belt. Amon testified he "hit her for a long time." Tino testified he heard the "constant" clapping or slapping sound of the belt striking Judith around 2:00 a.m.; he fell asleep and awoke ten to fifteen minutes later when he again heard the same slapping sound of the belt striking Judith; and he fell asleep again and awoke ten to fifteen minutes later and heard the same slapping sound of the belt striking Judith. At a minimum, there was evidence Amon struck Judith with a belt for over twenty minutes, with what Epperson described as force, energy, and anger. Judith's death was caused by the massive blunt force trauma inflicted in the beating that was so pervasive it caused DIC, a condition resulting in the inability of the blood to coagulate so as to stop or

---

[3] Having concluded there is sufficient evidence to establish Amon intended to cause serious bodily injury to Judith under penal code section 19.02(b)(2), we do not address Amon's contention in his first point of error that there is insufficient evidence to prove he intentionally or knowingly caused Judith's death under penal code section 19.02(b)(1). *See Hooper*, 214 S.W.3d at 14 (when trial court's charge authorizes a jury to convict on more than one theory, verdict of guilt will be upheld if evidence is sufficient on any of the theories); *see also* TEX. R. APP. P. 47.1.

–14–

mitigate internal bleeding. Epperson testified there was a point during the beating that Amon should have been aware the blows he was inflicting were "too much" and that Amon's beating of Judith was an act clearly dangerous to human life.

The evidence, and reasonable inferences that can be drawn from the evidence, are sufficient to show the manner of Amon's beating of Judith with a blunt object—a belt—was an act clearly dangerous to Judith's life that caused her death. *See Harrell v. State*, 659 S.W.2d 825, 827 (Tex. Crim. App. 1983) (under penal code section 19.02(a)(2), appellant intended to cause serious bodily injury to the deceased and committed an act clearly dangerous to human life that caused the death). We conclude a rational juror could have found beyond a reasonable doubt that Amon committed an act clearly dangerous to human life.[4] Accordingly, we resolve Amon's second point of error against him.

**Conclusion**

We affirm the trial court's judgment.

/Robert M. Fillmore/
ROBERT M. FILLMORE
JUSTICE

Do Not Publish
TEX. R. APP. P. 47.2(b)

150689F.U05

---

[4] *See also Simons v. State*, No. 05-15-00652-CR, 2016 WL 2935731, at *6 (Tex. App.—Dallas May 16, 2016, no pet.) (mem. op., not designated for publication) (regardless of whether he intended to kill victim, evidence, including defendant's testimony, showed he intended to cause serious bodily injury and committed an act clearly dangerous to human life).

–15–



## Court of Appeals
## Fifth District of Texas at Dallas

**JUDGMENT**

AMON TAWANDA DZWAIRO, Appellant

No. 05-15-00689-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the 219th Judicial District Court, Collin County, Texas,
Trial Court Cause No. 219-82237-2013.
Opinion delivered by Justice Fillmore,
Justices Francis and Schenck participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 25th day of July, 2016.